# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 26, 2012

Lyle W. Cayce
Clerk

No. 10-60891

LUMINANT GENERATION COMPANY, L.L.C.; OAK GROVE
MANAGEMENT COMPANY, L.L.C.; BIG BROWN POWER COMPANY,
L.L.C.; LUMINANT MINING COMPANY, L.L.C.; SANDOW POWER
COMPANY, L.L.C.; TEXAS ASSOCIATION OF BUSINESS; TEXAS
ASSOCIATION OF MANUFACTURERS; TEXAS OIL & GAS
ASSOCIATION; CHAMBER OF COMMERCE OF THE UNITED STATES
OF AMERICA; STATE OF TEXAS,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

On Petition for Review of an Order of
the United States Environmental Protection Agency

Before BARKSDALE, GARZA, and ELROD, Circuit Judges.[*]

JENNIFER WALKER ELROD, Circuit Judge:

This case requires us to review the EPA's disapproval, more than three years after the time within which it was statutorily required to act, of three regulations promulgated by the State of Texas. 30 Tex. Admin. Code §§ 116.610(a), 116.610(b), and 116.617. Pursuant to Texas's duty under the

---

[*] Emilio M. Garza, Circuit Judge, concurs in the judgment only.

No. 10-60891

Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7401 *et seq.*, to adopt and administer a statewide plan for implementing federal air quality standards, those regulations provide for a standardized permit for certain projects that reduce or maintain current emissions rates.  Because the EPA had no legal basis on which to disapprove those regulations, we VACATE the agency's disapproval of Texas's regulations and REMAND with instructions.

## I. BACKGROUND

*A. Statutory Background*

An "experiment in cooperative federalism," *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001), the CAA "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Group v. EPA*, 355 F.3d 817, 821–22 (5th Cir. 2003). The Act assigns responsibility to the EPA for identifying air pollutants and establishing National Ambient Air Quality Standards (NAAQS).  42 U.S.C. §§ 7408–7409.  The states, by contrast, bear "the primary responsibility" for implementing those standards.  *BCCA Appeal Group*, 355 F.3d at 822; *see also* § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within [its] entire geographic area."); § 7401(a)(3) ("[A]ir pollution prevention . . . is the primary responsibility of States and local governments.").

To implement the NAAQS, the states must adopt and administer State Implementation Plans (SIPs) that meet certain statutory criteria.  § 7410.  The states have "wide discretion in formulating [their] plan[s]."  *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976).  "[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation."  *Train  v. Natural Res. Def. Council, Inc.* 421 U.S. 60, 79 (1975).  With regard to implementation, the Act confines the EPA to the ministerial function of reviewing SIPs for consistency

No. 10-60891

with the Act's requirements. § 7410(k)(3) ("[T]he [EPA] Administrator *shall* approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter." (emphasis added)); *see also Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981) ("The great flexibility accorded the states under the Clean Air Act is . . . illustrated by the sharply contrasting, narrow role to be played by EPA."); *Michigan*, 268 F.3d at 1083 (the EPA's "overarching role is in setting standards, not in implementation"). This division of responsibility between the states and the federal government "reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government." *Fla. Power & Light Co.*, 650 F.2d at 581.

Under the Act, SIPs are not supposed to be static. States must periodically revise their SIPs as necessary to ensure compliance with current NAAQS. 42 U.S.C. § 7410(a)(2)(H). With a narrow exception not relevant here, the EPA must review and approve or disapprove a SIP revision within 18 months of submission. §§ 7410(k)(1)(B), 7410(k)(2), and 7410(k)(3). The EPA shall disapprove a SIP revision only if "the revision would interfere with any applicable requirement concerning attainment" of the NAAQS "or any other applicable requirement" of the Act. § 7410(*l*). As with SIP plans, if the revision meets all of the applicable CAA requirements, the EPA must approve it. § 7410(k)(3) (The EPA "shall approve such submittal as a whole.").

Among other requirements, SIPs must include permitting programs for the construction or modification of stationary sources. The EPA has termed these required permit programs "New Source Review" (NSR). 74 Fed. Reg. 51,418, 51,421 (Oct. 6, 2009). For "major" NSR, which applies to the construction or modification of stationary sources that meet certain threshold emissions levels, the CAA sets forth the parameters for the permit programs in considerable

3

detail.[2]  *See* 42 U.S.C. §§ 7470–7503.  The implementing regulations for major NSR are similarly extensive and complex, spanning 88 pages in the Code of Federal Regulations.  *See* 40 C.F.R. §§ 51.165–51.166, pt. 51 appendix S.

In stark contrast, the CAA prescribes only the barest of requirements for "minor" NSR, which governs the construction or modification of stationary sources that do not meet the emissions thresholds for major NSR.  For minor NSR, the Act requires simply that each SIP "include . . . regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that [NAAQS] are achieved."  42 U.S.C. § 7410(a)(2)(C).  The implementing regulations for minor NSR are likewise sparse, spanning less than two pages in the Code of Federal Regulations.  *See* 40 C.F.R. §§ 51.160–51.164.  The EPA has recognized that because "the Act includes no specifics regarding the structure or functioning of minor NSR programs" and because the implementing regulations are "very general[,] . . . SIP-approved minor NSR programs can vary quite widely from State to State."  74 Fed. Reg. 51,418, 51,421 (Oct. 6, 2009).

---

[2] The CAA's requirements for major NSR differ depending on whether a region is designated "nonattainment," "attainment," or "unclassifiable."  Part D of the Act, which governs nonattainment NSR, refers to "major stationary sources." 42 U.S.C. § 7502(c)(5). The Act defines that term as sources that have the potential to emit 100 tons or more of a regulated pollutant.  § 7602(j).  Part C of the Act, which applies the prevention of significant deterioration (PSD) program to attainment and unclassifiable regions, see § 7471, uses the term "major emitting facility."  § 7475. The Act defines that term as certain specified types of stationary sources that have the potential to emit 100 tons or more of a regulated pollutant and all other stationary sources that have the potential to emit 250 tons or more of a regulated pollutant.  § 7479(1).  For convenience, the EPA refers to both statutory terms as "major sources."  74 Fed. Reg. 51,418, 51,421 n.11 (Oct. 6, 2009).

No. 10-60891

*B. Facts and Proceedings*

The Texas standardized permit at issue here applies only to minor NSR,[3] and then only to pollution control projects (PCPs).  The regulations governing this permit (the PCP Standard Permit) are found at 30 Tex. Admin. Code § 116.617.  Those regulations authorize the standard permit for PCPs "that reduce or maintain currently authorized emission rates for facilities authorized by a permit."[4]  § 116.617(a)(1).  Detailed registration requirements apply.  *See* §§ 116.617(d)(2)(A)–(F), 116.617(b)(1)(D) (incorporating the standard permit registration requirements of § 116.611).  The PCP Standard Permit is also subject to Texas's general conditions for standard permits, which impose additional reporting, recordkeeping, and compliance requirements.  *See* § 116.615.  The executive director of the Texas Commission on Environmental Quality (TCEQ) has the negative discretion to disallow the use of any PCP standard permit if he "determines there are health effects concerns or the potential to exceed a [NAAQS] . . . until those concerns are addressed by the registrant to the satisfaction of the executive director."  § 116.617(a)(3)(B).  A "registration must be submitted no later than 30 days after construction or implementation begins" only for replacement PCPs that yield "no increases in authorized emissions of any air contaminant."  § 116.617(d)(1)(A).  By contrast, registration for new PCPs and replacement projects that will yield any increase in emissions must be submitted 30 days before construction or implementation. § 116.617(d)(1)(B).  Construction or implementation may not begin until 30 days

---

[3] If a project's collateral emissions meet the threshold level for major NSR, it must obtain an individual permit pursuant to Texas's major NSR permitting program.  30 Tex. Admin. Code § 116.617(b)(1)(C) (incorporating § 116.610(b)).

[4] Although somewhat counterintuitive, PCPs can fall within the bailiwick of the CAA's regulations because although the projects by definition reduce or maintain emissions of the primary pollutant, they have the potential to cause incidental increases in the emissions of other regulated pollutants.

No. 10-60891

after TCEQ receives the registration or until the executive director issues written acceptance. *Id.*

Texas's PCP Standard Permit is just one component of Texas's broader standard permits program. That program originated in 1993, when Texas promulgated standard permits for PCPs that reduce emissions of volatile organic compounds (VOCs) and nitrogen oxides (NOx). *See* 18 Tex. Reg. 8597 (Nov. 19, 1993) (VOC standard permit); 18 Tex. Reg. 3409 (May 28, 1993) (NOx standard permit). The next year, after notice and comment and a public hearing, Texas adopted regulations that set forth the general requirements for Texas's standard permits program. 19 Tex. Reg. 3055 (Apr. 22, 1994). In that same rulemaking, Texas expanded the availability of standard permits to PCPs for any regulated pollutant. *Id.* at 3064–65. Texas amended its standard permit program several times in the following years and submitted those revisions to the EPA for approval into Texas's SIP. *See* 68 Fed. Reg. 64,543, 64,547 (Nov. 14, 2003) (listing several SIP revision submissions from 1994 to 2002 concerning Texas's standard permits program).

In 2003, the EPA finally approved the standard permits program into Texas's SIP, explaining that the program met the applicable requirements of the CAA and its implementing regulations. *See id.* at 64,546–64,547 (approving 30 Tex. Admin. Code §§ 116.601–116.606, 116.610, 116.611, 116.614, and 116.615).[5] The EPA explicitly declined to act on § 116.617, which allows for a standard permit for PCPs. *Id.* at 64,547. The EPA commented that approval of § 116.617 was "not necessary" to its approval of the standard permits program and that § 116.617 would "be addressed in a separate action." *Id.*

Texas amended § 116.617 in 2006 to limit the availability of standard permits for PCPs to minor NSR only. *See* 31 Tex. Reg. 515, 516 (Jan. 27, 2006).

---

[5] The EPA took no action on 30 Tex. Admin. Code § 116.610(d). 68 Fed. Reg. at 64,547.

No. 10-60891

At the same time, Texas made necessary conforming amendments, as well as stylistic revisions, to SIP-approved §§ 116.610(a) and 116.610(b), which set forth general parameters for the applicability of Texas's standard permits program. *See id.*; *see also* 30 Tex. Reg. 6183, 6205 (Sept. 30, 2005) (proposed amendments). These amendments were necessary to bring Texas's PCP Standard Permit into compliance with federal standards after the D.C. Circuit vacated, as contrary to the CAA, an EPA rule that had altogether exempted PCPs from major NSR. *New York v. EPA*, 413 F.3d 3, 40–42 (D.C. Cir. 2005). After adopting these amendments through notice and comment rulemaking, on February 1, 2006, Texas resubmitted its newly amended versions of §§ 116.617, 116.610(a), and 116.610(b), among other provisions, to the EPA for approval into Texas's SIP. *See* 74 Fed. Reg. 48, 467, 48,471 (Sept. 23, 2009). Thus, pursuant to the Act's eighteen-month deadline, the EPA was required by statute to take action on Texas's submission by August 1, 2007, at the latest.

More than two years after the statutory deadline had passed, the EPA proposed disapproval of Texas's submission on September 23, 2009. *See id.* at 48,467. In proposing disapproval of Texas's PCP Standard Permit (§ 116.617), the EPA did not identify any provision of the CAA or its implementing regulations that Texas's program violated. *See* 74 Fed. Reg. at 48,475–76. Instead, the EPA asserted that "each minor NSR SIP Standard Permit . . . is required to be applicable to narrowly defined categories of emission sources rather than a category of *emission types*." *Id.* at 48,476 (emphasis in original). The only authorities that the EPA cited for this purported requirement were several internal memoranda and guidance documents, and a handful of rulemakings in which the EPA took action or proposed action concerning the adoption of general permit programs into other states' SIPs. *Id.* at 48,476 n.11. The EPA also stated that "another major concern is that this Standard Permit is designed for case-by-case additional authorization, source-specific review, and

7

No. 10-60891

source-specific technical determinations." *Id.* at 48,476. The EPA explained its concern as follows: "There are no replicable conditions in the PCP Standard Permit that specify how the [TCEQ] Director's discretion is to be implemented for the individual determinations." *Id.* The EPA cited no authority to tether its concern to any applicable provision of the CAA. *See id.* Moreover, as the EPA conceded in its brief, it provided no explanation for why it proposed disapproval of §§ 116.610(a) and 116.610(b).

The EPA issued its final rule disapproving, *inter alia*, §§ 116.617, 116.610(a), and 116.610(b), on September 15, 2010, more than three years after the statutory deadline. 75 Fed. Reg. 56,424 (Sept. 15, 2010). Although the EPA averred in its opening "Summary" section that it disapproved Texas's PCP Standard Permit "because it does not meet the requirements of the CAA for a minor NSR Standard Permit program," *id.*, the EPA again failed to identify a single provision of the Act that Texas's program violated, let alone explain its reasons for reaching its conclusion. Instead, in its discussion of Texas's PCP Standard Permit, the EPA stated no less than five times that it was disapproving the permit because it "does not meet the requirements of the *Texas* Minor NSR Standard Permits Program." *Id.* at 56,447 (emphasis added); *see also id.* at 56,444; *id.* at 56,445 (twice expressing the same conclusion); *id.* at 56,447 (same). In other words, the EPA utilized Texas law as its benchmark in disapproving § 116.617, not the CAA or its implementing regulations. Indeed, even when responding to comments that discussed whether § 116.617 meets the requirements of the CAA, the EPA did not address that question, but instead concluded that the PCP Standard Permit does not meet the requirements of *Texas's* SIP-approved standard permits program. *See* 75 Fed. Reg. at 56,445 (EPA's response to Comments 2 and 3). The EPA also reiterated the objections from its proposed disapproval that § 116.617 "does not apply to similar sources" and "lacks the requisite replicable standardized permit terms specifying how the

8

No. 10-60891

Director's discretion is to be implemented for the case-by-case determinations." *Id.* at 56,447. The EPA conceded in its brief that it again failed to provide any explanation for its disapproval of §§ 116.610(a) and 116.610(b).

Invoking our jurisdiction under 42 U.S.C. § 7607(b), numerous petitioners timely filed petitions for our review.[6] Only the EPA's disapproval of 30 Tex. Admin. Code §§ 116.610(a), 116.610(b), and 116.617 are presently before us.

## II. STANDARD OF REVIEW

When reviewing EPA action under the CAA, we apply the standard of review provided for in the Administrative Procedure Act (APA). *See Texas v. EPA*, 499 F.2d 289, 296 (5th Cir. 1974). Under the APA, we must hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We must also set aside agency action that is "in excess of statutory . . . authority." § 706(2)(C). Agency action

> is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

We must disregard any *post hoc* rationalizations of the EPA's action and evaluate it solely on the basis of the agency's stated rationale at the time of its decision. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69

---

[6] Petitioners are Luminant Generation Company, LLC; Oak Grove Management Company, LLC; Big Brown Power Company, LLC; Luminant Mining Company, LLC; Sandow Power Company, LLC; Texas Association of Business; Texas Association of Manufacturers; Texas Oil & Gas Association; Chamber of Commerce of the United States; and the State of Texas.

(1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))). "Review of agency action under § 706(2)'s 'arbitrary or capricious' standard is limited to the record before the agency at the time of its decision." *Geyen v. Marsh*, 775 F.2d 1303, 1309 (5th Cir. 1985); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

### III. DISCUSSION

The EPA concedes that it acted arbitrarily and capriciously by failing to supply any reason for its disapproval of §§ 116.610(a) and 116.610(b) and consents to vacatur. We therefore vacate the EPA's disapproval of these provisions and turn to § 116.617.

Petitioners contend that the EPA acted arbitrarily and capriciously and in excess of its statutory authority by applying three different incorrect legal standards in disapproving 30 Tex. Admin. Code § 116.617. First, Petitioners argue that the EPA improperly reviewed the PCP Standard Permit for compliance with Texas law, when the EPA's only authorized function was to review the permit for compliance with the applicable requirements of the CAA. Second, Petitioners argue that the EPA's so-called "similar source" requirement does not exist in any of the CAA provisions governing minor NSR. Third, Petitioners argue that the applicable federal law imposes no "replicability" requirement and, therefore, the EPA had no basis on which it could have properly determined that the TCEQ Director's discretion under § 116.617 violated the Act. As we now explain, each of Petitioners' arguments is correct.

No. 10-60891

*A. The EPA's Reliance on Texas Law*

It is beyond cavil that the EPA may consider only the requirements of the CAA when reviewing SIP submissions.  The Act provides that the EPA "shall approve [a SIP] submittal as a whole if it meets all of the applicable requirements of [the Act]."  42 U.S.C. § 7410(k)(3).  This statutory imperative leaves the agency no discretion to do anything other than ensure that a state's submission meets the CAA's requirements and, if it does, approve it before the passage of its statutory deadline.  Moreover, the provisions of the Act that govern minor NSR and the EPA's review of SIP revisions make no allowance for the EPA to evaluate the submission for compliance with state law.  *See* § 7410(a)(2)(C) (the Act's only requirement for minor NSR is that each SIP "include . . . regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that [NAAQS] are achieved"); § 7410(*l*) (the EPA may disapprove a SIP revision only if "the revision would interfere with any applicable requirement concerning attainment" of the NAAQS "or any other applicable requirement of [the Act]").  As the EPA itself has recognized, nowhere does the Act authorize EPA review of SIP revisions for conformity with state law: "Section [7410(*l*)] requires us to evaluate proposed SIP revisions in relation to applicable requirements of the CAA, *not state rules*."  73 Fed. Reg. 60,957, 60,961 (Oct. 15, 2008) (emphasis in original) (approving a revision to Alabama's SIP).

In this case, the EPA overstepped the bounds of its narrow statutory role in the SIP approval process.  As mentioned, on five separate occasions the EPA gave as its reason for disapproving the PCP Standard Permit that it "does not meet the requirements of the *Texas* Minor NSR Standard Permits SIP."  75 Fed. Reg. 56,424, 56,445 (Sept. 15, 2010) (emphasis added).  This attempt by the EPA to enforce state law standards was *ultra vires*.  It was "in excess of statutory . . . authority," in contravention of 5 U.S.C. § 706(2)(C).  In addition, because state

11

No. 10-60891

law is a "factor[] which Congress has not intended [the EPA] to consider," the EPA's reliance on it was arbitrary and capricious. *State Farm*, 463 U.S. at 43.

The EPA now attempts to discount its repeated invocation of state law standards by pointing to its passing assertions in its final rule that the "EPA is disapproving the [PCP Standard Permit] because it does not meet the requirements of the CAA," 75 Fed. Reg. at 56,424, and that the "EPA reviews a SIP revision submission for its compliance with the Act and EPA regulations." *Id.* at 56,447. This will not do, however, because these bald assertions are belied by the entirety of the EPA's discussion of the PCP Standard Permit. Nowhere in either the proposed or final disapproval does the EPA explain how the PCP Standard Permit is inconsistent with any particular provision of the Act. In addition to the EPA's five unambiguous statements that it relied on Texas law, a holistic review of the EPA's analysis demonstrates that it evaluated the PCP Standard Permit for compliance with the features of Texas's SIP-approved standard permits program, not the requirements of the CAA. *See, e.g., id.* at 56,445 (discussing at length the ways in which the PCP Standard permit purportedly "does not meet the requirements of" Texas's standard permits program). The EPA impermissibly treated Texas's standard permits program as if it were the applicable legal standard.[7]

## B. The So-Called "Similar Source" Requirement

In addition to disapproving the PCP Standard Permit for not complying with the EPA's interpretation of Texas law, the agency also disapproved it on the

---

[7] Nor could the EPA have lawfully treated Texas's SIP-approved standard permits program as a proxy for the CAA's requirements in this case, as the EPA suggested at oral argument. That the standard permits program meets the CAA's requirements does not mean that it supplants those requirements in the next case. It may be that the program passed CAA muster with flying colors, and that the PCP Standard Permit could likewise satisfy the Act even assuming, for argument's sake, that it does not meet the high standards of the standard permits program and is significantly less environmentally protective (assumptions that Petitioners vigorously dispute and that seem unlikely given that PCPs are, by definition, environmentally protective).

grounds that its availability is not limited to "similar sources." 75 Fed. Reg. at 56,447. According to the EPA's proposed disapproval, the "similar source" requirement limits the availability of each standard permit to a "narrowly defined categor[y] of emission sources," such as "oil and gas facilities, asphalt concrete plants, and concrete batch plants." 74 Fed. Reg. at 48,476 & n.10. Petitioners challenge the EPA's authority to impose a "similar source" requirement, arguing that no such requirement exists in any applicable provision of the CAA or its implementing regulations. The EPA parries that it has "properly tie[d] the requirement that general permits be limited to similar sources to CAA section 110(a)(2) [42 U.S.C. § 7410(a)(2)] requirements that control measures be enforceable." The EPA then points to several agency guidance documents that are said to "elucidate principles" relevant to its interpretation of the Act—presumably out of the hope that we will apply *Chevron* deference in reviewing that interpretation. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Petitioners reply that the EPA's "similar source" requirement merits no deference and is without support in the CAA.

We first address what level of deference, if any, we owe to the EPA's interpretation of § 7410(a)(2) as embracing a "similar source" requirement. We do not owe any deference to that interpretation based on the EPA's insistence on a "similar source" requirement in its proposed and final disapproval. That is because nowhere in the rulemaking record does the EPA even hint that the "similar source" requirement reflects its interpretation of any applicable provision of the CAA or its implementing regulations.[8] There is thus no agency

---

[8] To the contrary, the EPA suggested in its final rule that the "similar source" standard derives from Texas law. *See, e.g.,* 75 Fed. Reg. at 56,444 ("Under the Texas Standard Permits Minor NSR SIP, an individual Standard Permit must be limited to new or existing similar sources."). Insofar as the "similar source" requirement reflects the EPA's interpretation of Texas law, imposition of it here is *ultra vires* for the reasons discussed above in Part III.A.

No. 10-60891

interpretation in the rulemaking record to which to defer. *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (setting forth the framework for when and to what degree courts must defer to agency interpretation "of a particular statutory provision"). For this same reason we owe no deference to the "similar source" requirement based on the EPA's citation to agency guidance documents. *See* 74 Fed. Reg. at 48,476 n.11 (citing various agency guidance documents). The EPA concedes that these documents do not interpret the relevant statutory provisions—that is, those that govern SIP approval of minor NSR. *See* 75 Fed. Reg. at 56,447 ("The utility of these citations is not in the specific subject matter they address, but in their discussion of the regulatory principles to be applied in reviewing permit schemes that adopt emission limitations created through standardized protocols.").[9]

Nevertheless, we must still consider whether we owe some measure of deference to the EPA's interpretation of the Act in its appellate brief, which represents the first time it has argued that the CAA authorizes it to impose a "similar source" requirement on minor NSR. *Chevron* deference is out of the question. *See Pool Co. v. Cooper*, 274 F.3d 173, 177 n.3 (5th Cir. 2001) (litigation briefs are not entitled to *Chevron* deference). Still, we ordinarily must afford a weaker form of deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to agency interpretations of statutes they administer that do not carry the force of law and, therefore, do not command *Chevron* deference. *Mead*, 533 U.S. at 234–35. The deference due under *Skidmore* varies with the persuasive force of

---

[9] The EPA stated in its final disapproval that "[t]he memoranda cited in the proposal were cited for the purpose of providing documentary evidence of how EPA has exercised its *discretionary* authority when reviewing general permit programs similar to the Texas Standard Permits SIP." *Id.* (emphasis added). This statement reflects a misapprehension by the EPA of its authorized role in the SIP-approval process. As discussed above, the EPA does not possess any "discretionary authority" in that process. *See* 42 U.S.C. § 7410(k)(3). Only the states enjoy discretion in implementing the dictates of the CAA. *See, e.g., Union Elec. Co.*, 427 U.S. at 250 ("Each State is given wide discretion in formulating its [SIP].").

the agency interpretation. *See id.* at 228. In *Mead*, the Court described as "near indifference" the level of *Skidmore* deference due "an interpretation advanced for the first time in a litigation brief." *Id.* (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212–13 (1988)). In discussing the deference question in *Bowen*, the Court explained that "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Bowen*, 488 U.S. at 213. Thus, it appears that although we are bound to extend some modicum of deference to the EPA's appellate counsel's interpretation, that degree of deference is minimal. *See Mead*, 533 U.S. at 228 (the approach outlined in *Skidmore* "has produced a spectrum of judicial responses," with deference to litigation briefs at the lowest end of that spectrum).

Even affording *Skidmore* deference to the EPA's interpretation of the CAA, we agree with the Petitioners that the Act does not authorize the EPA to impose a "similar source" requirement on minor NSR.[10] We have already made clear that the Act empowers the EPA to disapprove a SIP revision only "if the revision would interfere with any applicable requirement concerning attainment [of the NAAQS] . . . or any other applicable requirement of [the Act]." § 7410(*l*). Otherwise the EPA must approve the revision. § 7410(k)(3).

We can quickly dispense with any supposition that inclusion of a "similar source" rule in the PCP Standard Permit is necessary to prevent interference with the NAAQS. The Texas regulations governing the PCP Standard Permit provide that "[t]his standard permit must not be used to authorize [any PCP] that . . . the [TCEQ] executive director determines [has] the potential to exceed a [NAAQS]." 30 Tex. Admin. Code § 116.617(a)(3)(B). Given this provision,

---

[10] We note that the interpretation advanced in the EPA's brief is not particularly persuasive because the agency's brief merely asserts, without any statutory analysis or support, that the "EPA properly ties the requirement that general permits be limited to similar sources to CAA section 110(a)(2) requirements that control measures be enforceable."

No. 10-60891

which makes the PCP Standard Permit unavailable for any PCP that has even the potential to cause a breach of the NAAQS, we cannot say that the permit "*would* interfere" with the NAAQS. 42 U.S.C. § 7410(*l*) (emphasis added). Indeed, it is impossible for the PCP Standard Permit to cause interference with the NAAQS, provided that we assume, as we ought, that Texas will enforce this provision of its own regulations. *See City of Seabrook, Tex. v. EPA*, 659 F.2d 1349, 1367 (5th Cir. 1981) (admonishing that the "EPA could assume [that the] state would implement [its regulations and if it] fails to do so, then either the EPA or a concerned citizen may bring an enforcement action").

Nor can we accept the EPA's argument that its "similar source" requirement is an applicable provision of the Act. First, the "similar source" requirement finds no purchase in the text of any applicable provision of the Act. *See* § 7410(a)(2)(C) (each SIP minor NSR program need only "include . . . regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that [the NAAQS] are achieved").[11] In addition, the inclusion of a "similar source" requirement elsewhere in the Act is strong evidence that the requirement does not apply to minor NSR. Title V of the CAA, which governs operating permits, explicitly imposes a "similar source" limitation. *Compare* § 7661c(d) (operating permit rules) *with* § 7410 (containing the requirements for minor NSR); *see Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("'[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is

---

[11] The EPA also argues that a "similar source" limitation is necessary to ensure enforceability. The only mention of enforceability in § 7410 is the requirement that SIPs "include enforceable emission limitations and other control measures . . . as may be necessary or appropriate to meet the applicable requirements of this chapter." § 7410(a)(2)(A). However, the only requirement in this chapter applicable to minor NSR is that the SIP include "regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that [NAAQS] are achieved." § 7410(a)(2)(C). As explained above, the PCP Standard Permit necessarily meets this requirement because it is unavailable for any PCP that has even the potential to cause a breach of the NAAQS.

16

No. 10-60891

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Finally, the structure of the CAA militates against reading an extra-statutory requirement into the Act's limitations on state discretion. Because the states enjoy "wide discretion" in implementing the Act, the imposition of newfound restrictions upsets the Act's careful balance between state and federal authority. *Union Elec. Co.*, 427 U.S. at 250; *see also Fla. Power & Light Co.*, 650 F.2d at 587 ("The great flexibility accorded the states under the Clean Air Act is . . . illustrated by the sharply contrasting, narrow role to be played by EPA."). This structural principle applies with special force in this case because, as previously discussed, the Act imposes only the most minimal of requirements on minor NSR.

Because the so-called "similar source" requirement is neither necessary to safeguard the NAAQS nor warranted by any applicable provision of the Act, we must conclude that the EPA's insistence upon it here was unjustified. Like the EPA's reliance on its interpretation of Texas law, its imposition of a "similar source" standard was arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider"). The EPA's attempt to graft a "similar source" rule onto the applicable provisions of the CAA was also a violation of 5 U.S.C. § 706(2)(C), which requires reviewing courts to set aside agency action that is "in excess of statutory . . . authority."

*C. "Replicability"*

Petitioners further argue that the EPA lacked the authority to disapprove the PCP Standard Permit based on its view that the permit affords the TCEQ Director too much discretion under certain circumstances. The EPA took issue with this provision of the permit because, in the EPA's view, it does not include any "replicable" limits on how the Director is to exercise his discretion. In a

17

different context, the EPA has defined "replicability" to mean "procedures [that] are sufficiently specific and nonsubjective so that two independent entities applying the procedures would obtain the same result." 57 Fed. Reg. 13,498, 13,568 (Apr. 16, 1992) (outlining guidelines for states when developing an overall SIP control strategy). The EPA's proposed disapproval expressed its objection as follows: "There are no replicable conditions in the PCP Standard Permit that specify how the Director's discretion is to be implemented." 74 Fed. Reg. at 48,476. The EPA explained in its final rule that one reason it was disapproving Texas's PCP Standard Permit is that it "lacks the requisite replicable standardized permit terms specifying how the Director's discretion is to be implemented for the case-by-case determinations." 75 Fed. Reg. at 56,447. Petitioners contend that the EPA's reliance on this rationale was impermissible because there is no applicable provision of the Act or the EPA's implementing regulations that requires a state's minor NSR program to include replicable permit conditions.[12]

---

[12] Petitioners also point out that the lack of "replicable" conditions is not problematic here because the permit only grants the Director the discretion to require *more* of registrants if he is concerned that a registration will threaten public health or the NAAQS. The provision at issue states: "This standard permit must not be used [if] the executive director determines there are health effects concerns or the potential to exceed a [NAAQS] . . . until those concerns are addressed by the registrant to the satisfaction of the executive director." 30 Tex. Admin. Code § 116.617(a)(3)(B). We confess that we are at a loss to comprehend the EPA's concern. Subsection 116.617(a)(3)(B) in no way jeopardizes the NAAQS. Instead, it safeguards them. It provides a safety valve procedure whereby, in the event a registration should present even the potential of threatening the NAAQS or public health, the Director is authorized to intervene and require the registrant to take additional steps to protect air quality.

Moreover, the EPA's concern about the Director's discretion is especially perplexing in light of its approval, just seven months before it disapproved Texas's PCP Standard Permit, of similar Georgia regulations that are less environmentally protective and afford the Georgia director far greater discretion than the Texas Director. *See* 75 Fed. Reg. 6,309 (Feb. 9, 2010) (approving Ga. Comp. R. & Regs. 391–3–1–.03(6)(j) into Georgia's SIP). Georgia's regulations *exempt* PCPs from minor NSR construction permitting. Ga. Comp. R. & Regs. 391–3–1–.03(6)(j). The EPA approved this provision because it "applies to minor sources only." 75 Fed. Reg. at 6,312. So too does Texas's PCP Standard Permit. 30 Tex. Admin. Code § 116.617(b)(1)(C). The Georgia director has discretion whether or not to require certain ongoing monitoring and reporting requirements. *See* Ga. Comp. R. & Regs. 391–3–1–.03(2)(c)

No. 10-60891

Petitioners are correct. The EPA had no legal basis to demand "replicable" limitations on the Director's discretion.  Not once in its proposed or final disapproval, or in its argument before this court, has the EPA pointed to any applicable provision of the Act or its regulations that includes a "replicability" standard.  Moreover, the EPA cannot argue that the lack of replicable conditions would interfere with the NAAQS because, as we have explained, § 116.617(a)(3)(B) can only serve to protect the NAAQS.  Thus, the EPA had no statutory basis under 42 U.S.C. § 7410(*l*) to disapprove Texas's SIP revision because of "replicability" concerns.

This straightforward conclusion is unaffected by the EPA's invocation of an agency policy document, entitled the "General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990."  57 Fed. Reg. 13,498 (Apr. 16, 1992) [hereinafter General Preamble].  The only portion of the rulemaking record that discusses the General Preamble is  Section IV.A of the proposed rule, which begins with the heading: "What are the Requirements for EPA's Review of a Submitted *Major* NSR SIP Revision?"  74 Fed. Reg. at 48,471–72 (emphasis added).  The EPA's discussion of the PCP Standard Permit appears pages later, in Section VII of the proposed rule, under the heading: "Does the Submitted PCP Standard Permit Meet the *Minor* NSR SIP Requirements?"  *Id.* at 48,475–76.  Thus, it is *post hoc* rationalization for the EPA now to argue that it relied on the General Preamble in concluding that § 116.617(a)(3)(B)—which indisputably applies only to minor sources—"lacks the requisite replicable standardized terms."  75 Fed. Reg. at 56,447 (final rule).  We must disregard this *post hoc* rationale.  *See Burlington Truck Lines*, 371 U.S. at

("As a condition for the issuance of an operating permit, the Director may require the applicant to conduct performance tests and monitoring and provide reports concerning operations.").  By contrast, Texas's detailed reporting, recordkeeping, and monitoring requirements are mandatory.  *See* 30 Tex. Admin. Code §§ 116.617(b)(1), 116.617(e).

168–69.  Moreover, even if we were to consider the 1992 General Preamble, it would not change our conclusion that the CAA does not impose a "replicability" standard on minor NSR.  We do not owe *Chevron* deference to the General Preamble because, by its own terms, it does not carry the force of law.  *See Mead*, 533 U.S. at 226–27 (*Chevron* deference only due agency statutory interpretations "promulgated in the exercise of" the agency's delegated authority "to make rules carrying the force of law").  The General Preamble states unequivocally that it represents only the "EPA's preliminary interpretations, and thus do[es] not bind the States and the public as a matter of law."  57 Fed. Reg. at 13,498.  Although *Skidmore* instructs us to defer to agency interpretations insofar as they are persuasive, *see Mead*, 533 U.S. at 234–35 (*Skidmore* deference due agency interpretations that do not qualify for deference under *Chevron*), in our view the General Preamble's discussion of "replicability" does not reflect a persuasive interpretation of the provisions of the CAA applicable to minor NSR.  As the State of Texas correctly observes in its reply brief, the General Preamble "does not expressly address Minor NSR SIP revisions" and was issued in response to CAA amendments "dealing with SIP requirements for *major* sources in nonattainment areas" (emphasis in original).

Like Texas law and the "similar source" limitation, "replicability" is not a legal standard that the Act authorizes the EPA to enforce when reviewing a state's minor NSR program.  Thus, the EPA acted "in excess of statutory . . . authority," and thereby violated 5 U.S.C. § 706(2)(C), by disapproving the PCP Standard Permit based on the want of replicable limitations in 30 Tex. Admin. Code § 116.617(a)(3)(B).  Moreover, "replicability" was (yet another) "factor[] which Congress has not intended [the EPA] to consider," meaning the EPA's reliance on it was (yet again) arbitrary and capricious agency action.  *State Farm*, 463 U.S. at 43.

No. 10-60891

## IV. CONCLUSION

This chapter in regulatory history has lasted almost two decades. Texas submitted its first two standard permits for PCPs to the EPA for approval in 1994. Texas made various amendments to these permits over the years, and promptly submitted each amendment to the EPA. The most recently amended version is the PCP Standard Permit at issue in this case. Despite an eighteen-month statutory deadline, the EPA did not take action on any of these submissions until September 15, 2010. At that late date, the EPA disapproved the PCP Standard Permit—submitted four and a half years earlier—based on its purported nonconformity with three extra-statutory standards that the EPA created out of whole cloth. Moreover, the EPA did this in the context of a cooperative federalism regime that affords sweeping discretion to the states to develop implementation plans and assigns to the EPA the narrow task of ensuring that a state plan meets the minimum requirements of the Act. The EPA applied these unauthorized standards to disapprove of a state program for projects that reduce air pollution and that, under the Act's plain terms, is subject to only the most minimal regulation.

Because the EPA waited until more than three years after the statutory deadline to act on Texas's submission, we order the EPA to reconsider it expeditiously. On remand, the EPA must limit its review of Texas's regulations to ensuring that they meet the minimal CAA requirements that govern SIP revisions to minor NSR, as set forth in 42 U.S.C. § 7410(a)(2)(C) and § 7410(*l*). If Texas's regulations satisfy those basic requirements, the EPA must approve them, as § 7410(k)(3) requires.[13] That is the full extent of the EPA's authority

---

[13] It is difficult to conceive, and the EPA has not suggested, how it could disapprove the PCP Standard Permit under the appropriate statutory factors. The provisions of the CAA that apply to minor NSR require state regulation only insofar as is necessary to assure achievement of the NAAQS, see 42 U.S.C. §§ 7410(a)(2)(C), 7410(*l*), and Texas's regulations provide that "[t]his standard permit must not be used to authorize [any PCP] that . . . the

21

in the SIP-approval process because that is all the authority that the CAA confers. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

We VACATE the EPA's disapproval of 30 Tex. Admin. Code §§ 116.610(a), 116.610(b), and 116.617 and REMAND with instructions that the EPA reconsider these regulations and approve or disapprove them most expeditiously.

---

[TCEQ] executive director determines [has] the potential to exceed a [NAAQS]." 30 Tex. Admin. Code § 116.617(a)(3)(B). In addition, we have already concluded that each of the EPA's grounds for disapproval was unlawful. Finally, when pressed at oral argument, the EPA was unable to identify any legal deficiency with the PCP Standard Permit—other than its supposed failure to meet the EPA's extra-statutory requirements that today we hold unlawful—despite the half decade the EPA has had to evaluate it. Nevertheless, we defer to the agency to reevaluate Texas's regulations in light of the proper CAA standards.