*587 LESLIE H. SOUTHWICK, Circuit Judge,
concurring in the judgment:
I agree we should deny the petition for review. Respectfully, my reasoning differs from that of the majority.
After notice and comment, EPA offered four reasons for disapproving the Qualified Facilities Program (QFP) as a Minor New Source Review (NSR) revision to Texas’s state implementation plan (SIP): (1) the regulatory text permits evasion of Major NSR requirements; (2) its “netting” features jeopardize attainment and maintenance of national ambient air quality standards (NAAQS); (3) Texas did not furnish the necessary data and modeling to predict whether the QFP’s impact on future air quality would truly be de minimis; and (4) the definition of “facility” in the program was overly broad. See 75 Fed.Reg. 19,468, 19,473-19,474 (Apr. 14, 2010) (to be codified at 40 C.F.R. pt. 52). I do not join the majority in ratifying the first of these. Aso, like the majority, I express no position on the final two. I conclude the problems identified by EPA with netting are sufficiently supported by the record and justify denial of the petition.

I. EPA’s Legal Interpretation

My concern with the majority’s approach is that, central to its reasoning, we are taking sides in a dispute over drafting styles. Invoking Chevron, EPA argues that the court should defer to its “legal interpretation” that without explicit text warning that major sources may not use this program, the QFP cannot be understood solely to pertain to minor sources of pollution. 75 Fed.Reg. at 19,476, 19,469.
Texas rightly observes that express negative language is not the only way to convey a limitation. I see no reason to credit EPA for any expertise on whether Texas should express the purposes of this program in a negative or affirmative manner, so long as it is clear. For example, EPA has not pointed to evidence from its regulatory experiences that affirmative descriptions of plan coverage are less effective than negative statements. Experience might be a foundation for expertise here, or at least be a basis for arguing it. On this record, I see nothing beyond a quibble. Without any historical pattern or other basis to support the preference, insisting on one expression compared to the other is arbitrary and, perhaps more accurately, capricious.
Texas still must have given an adequate affirmative explanation. It identified an applicant’s affirmative obligation to comply with Major NSR requirements. See Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519, 526 (5th Cir.2008). It argues that the QFP requires persons modifying a qualified facility to keep documentation and information sufficient “to show that the project will comply with § 116.150 and § 116.151 of this title (relating to Non-attainment Review) and §§ 116.160-116.163 of this title (relating to Prevention of Significant Deterioration Review).” 30 Tex. Admin.Code § 116.117 (1998). These Nonattainment and so-called PSD programs only regulate major sources, leading EPA to refer to them “together as the major NSR program.” 74 Fed.Reg. 51,-418, 51,421 (Oct. 6, 2009) (to be codified at 40 C.F.R. pts. 70-71). The Texas Commission on Environmental Quality has always considered QFP to be exclusively a Minor NSR program. EPA acknowledges that fact. 75 Fed.Reg. at 19,476.
Confronted with a dispute between Texas and EPA about the meaning of the submitted SIP, the majority, implicitly as a matter of administrative deference, privileges EPA’s construction. E.g., Chevron, USA, Inc. v. NRDC, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). I would not. It is of some significance that *588 the SIP is purely state law until approved; the Texas Legislature enacted it with Senate Bill 1126 — an amendment to the Texas Clean Air Act. This fact is not conclusive, since in a given situation EPA’s environmental expertise might improve its understanding of a proposed SIP, warranting some deference.[1] As to whether the Texas Administrative Code codifies the prohibition that the Texas Commission on Environmental Quality claims it does, I do not believe EPA has special policy insight. There is no plausible account that Congress would have wished for EPA to “enjoy primary interpretational authority” as to how Texas law should express itself. United States v. Mead Corp., 533 U.S. 218, 230 n. 11, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quotation marks and citation omitted); see also Mayo Found, for Med. Educ. & Research v. United States, — U.S.-, 131 S.Ct. 704, 714, 178 L.Ed.2d 588 (2011). The majority makes reasonable efforts to distinguish these authorities factually, as they are distinguishable, but does not support its own position that a federal agency would be owed Chevron deference in a situation such as this.
Though I do not agree that Chevron has any relevance here, I would prefer neither reaching that issue nor deciding which party has the more persuasive interpretation of the QFP. Even stipulating that the program is limited to Minor NSR, EPA’s disapproval may stand under the APA.
I turn now, briefly, to why I believe that is so.

II. Netting

As an experiment in deregulation, the premise behind the QFP proposal is that physical changes that do “not result in a net increase in allowable emission[s]” are no longer defined as facility modifications. 30 Tex. Admin. Code § 116.10(11)(E) (2002). As a consequence, they avoid the need to secure a Minor NSR permit under one of the mechanisms provided for in the already approved SIP. Credible netting is thus the glue that holds the program together.
EPA “disapprove[d] netting under the Qualified Facilities Program as a Minor NSR program, in part because the Program fail[ed] to ensure that ambient air is protected in consideration of all changes in the netting.” 75 Fed.Reg. at 19,477. At least two particular faults in QFP netting identified in the final rule stand out as valid, justifying agency disapproval.
First, the program “fails to define a contemporaneous period or require that emission reductions occur within a specified period.” 75 Fed.Reg. at 19,478. In other words, the program does not specify the time frame for when a pollution increase must be offset. Unlike as to Major NSR evasion, this is not a matter of interpretation, but rather of complete statutory and regulatory silence.[2]
*589 Second, EPA found a weakness in the pollutant interchange methodology, a technical subject at the heart of its environmental expertise. QFP permits “[e]missions of different compounds within the same air contaminant category” to be interchanged. 30 Tex. Admin. Code § 116.116(e)(8)(B) (2000). An “air contaminant category” is defined as “a group of related compounds, such as volatile organic compounds, particulate matter, nitrogen oxides, and sulfur compounds.” § 116.116(e)(3)(F). Because the term “sulfur compounds” embraces both hydrogen sulfide and sulfur dioxide, EPA reasonably concluded that this definition would jeopardize the NAAQS for sulfur dioxide. By the same token, the general category “particulate matter” would permit increases of smaller particulate (PM-2.5) to be offset by reductions in larger ones (PM-10). Different NAAQS govern PM-2.5 and PM-10, because generally the more fine a particulate, the more deleterious to human health.
Establishing, monitoring, and enforcing the nation’s air quality standards is EPA’s central charge under the Clean Air Act. State SIPs are the means to these ends, and EPA “shall not approve a revision” to a SIP if it “would interfere” with NAAQS. See 42 U.S.C. § 7410(a)(Z). In accord with this statutory mandate, in terms of timing and how pollutants are defined, EPA found that the QFP would undermine specific NAAQS. Because these conclusions are rooted in agency expertise, adequately explained, and based on the congressionally prescribed factors, our duty is to uphold EPA’s final action to disapprove. See Lu-minant, 675 F.3d at 925 (discussing the court’s purview under the APA, 5 U.S.C. § 706).
I therefore concur in the judgment.

. As this court recently recognized, "extensive and complex" requirements govern Major NSR, while "[i]n stark contrast, the CAA [Clean Air Act] prescribes only the barest of requirements for ‘minor’ NSR.” Luminant Generation Co. v. EPA, 675 F.3d 917, 922 (5th Cir.2012). Thus, Texas is correct that EPA may not condition Minor NSR approval on features imported from Major NSR, as this would upset the statutory scheme. While references to "contemporaneous” reductions are indeed found in the Major NSR rules, 40 C.F.R. § 51.165(a)(l)(vi)(A)(2), offsets without some time-equivalence cannot in any logical sense be said to be net-neutral. As such, EPA is justified in insisting on this bedrock feature, dictated by common sense.